BOORMAN & JOHNSTON *vs.* T. W. &. W. L. JENKINS.

Where a *cotton broker*, with the permission of the owner, having taken *samples* of a cargo of cotton, exhibits them to a purchaser, who makes a purchase of a portion of the cargo upon the strength of the samples, without inspecting or examining the bales containing the cotton ; and the owner agrees to accept the price offered, delivers the cotton and pays the brokerage ; such transaction is a *sale by sample*, the broker is the *agent of the owner*, and the latter is liable for a breach of warranty, if the bulk of the cotton does not correspond with the samples exhibited.

Every sale of *packed cotton* is a *sale by sample*, and a sale by sample is *per se* a *warranty* that the bulk shall correspond with the sample.

Evidence of *usage* in a *particular trade* is admissible for the purpose of showing the mode of effecting sales; so also for the purpose of annexing incidents to a written instrument, concerning which the instrument is silent ; thus *evidence* may be given to show that, according to the known usage of the trade, cotton is sold by sample; and then it may be shown by *parol* that a particular sale of cotton was a *sale by sample*, although the entry in the broker's book, the bought and sold note, and the bill of parcels are *silent* in that respect.

A plaintiff may recover for *breach of warranty* in the sale of property, although before the payment of the note given by him on the transfer of the property, he had notice of a breach of the warranty, and notwithstanding paid it, if the extent of the damage sustained by him was not then ascertained.

It is not necessary to the maintenance of an action for *damages* for breach of warranty in the sale of personal property, that the plaintiff should have *returned* or *offered to return* the property sold ; a return or offer must be shown only where the plaintiff disaffirms the contract, and seeks to recover back the money or other consideration paid by him.

A variance between the declaration and proof as to the terms of sale, is not a ground of nonsuit, if the declaration be amendable.

ERROR from the superior court of the city of New-York. The declaration of the Messrs. Jenkins against Boorman and Johnston in the court below contained three counts, besides the money counts. In the *first count* it was stated that on-

ALBANY,
Oct., 1834.

Boorman
v.
Johnston.

&c. at, &c. in consideration that the plaintiffs, at the instance and request of the defendants, would buy of them *eighty-nine* bales of cotton for the sum of 11 cts. per lb., to be therefor paid by the plaintiffs, the defendants undertook and promised that *all of the cotton was like to and as good as certain samples exhibited by the defendants*, and that the plaintiffs, confiding in such promise of the defendants, did, on the same day buy the 89 bales of cotton, and afterwards on, &c. at, &c. paid the defendants for the same $10,000. The plaintiffs then assign for breach of the promise, that the defendants deceived and defrauded them in this, to wit, that a large proportion of the cotton, to wit, 100.000 lbs. of it, at the time of the making of the promise, *was not like to or as good as the samples* exhibited to them, but on the contrary was poor, damaged and of little or no value. The plaintiffs then state, as *special damage*, that they sold the cotton to the *Dorchester Cotton and Iron Factory*, an incorporated company in Massachusetts, and that confiding in the undertaking of the defendants, they, the plaintiffs, warranted the cotton to be like to and as good as the samples exhibited *to* the plaintiffs at the time of the purchase, which samples were exhibited *by* the plaintiffs to the company at the time of the sale to them; that the company having discovered the cotton to be damaged, commenced a suit against the plaintiffs, and obliged them to pay $500 for the violation of their contract, and for the costs of suit; and that they also paid $200 for the costs of the defence; that the present defendants had notice of such suit, and were requested to defend the same, but refused so to do. The *second count* is like the first except that it states the purchase of 100 bales of cotton, and the sale of 89 bales to the Dorchester factory; and the *third count* is like the first, except as to the statement of special damage. The defendants pleaded the general issue.

On the trial of the cause in the superior court before Mr. Justice Oakley, in November, 1830, the following facts appeared; on the *ninth* of April, 1828, the plaintiffs applied to the firm of James Blackstock & Co., *cotton brokers* in the city of New-York, to purchase of them a quantity of cotton. The brokers exhibited *samples* of a lot of cotton belonging to the defendants, and the plaintiffs made an offer for the purchase

of 100 bales, which offer was communicated to the defendants and accepted by them, upon which the sale was concluded and an entry thereof made in the book of the brokers, in these terms: "April 9, 1828, sold for Boorman & Johnston, to T. W. Jenkins & Co., 100 sq. bales New-Orleans cotton, at 11 cts., 90 days. J. B. & Co." and a copy of the entry delivered to the parties respectively. The brokers testified that the cotton was sold by *sample*, that there was no offer to exhibit the bales containing the cotton, and that neither they or the plaintiffs had seen the cotton in bales at or previous to the sale; that the whole negotiation was conducted by them, and that the plaintiffs and the defendants did not meet until after the conclusion of the sale. The broker who made the entry of the sale, testified that he never inserted in his entries of sales of cotton, that the sale was a *sale by sample*, if such was the fact; nor was it usual for him to state in the entry that a *note was to be given* in payment, if such was the agreement; that in the entry made in this case, it was not stated that a note was to be given payable in 90 days, though such was the understanding of the parties. This latter testimony was received by the judge, although objected to by the defendants as inadmissible, on the ground that it was not competent to vary by *parol* evidence the entry in the broker's book. The cotton was not delivered until the *twenty-third* of April, when it was weighed by a weigh-master. An agent of the brokers, one usually employed by them to take samples of cotton, attended at the time and inspected the bales as they were weighed, which he did at the request of the brokers, in consequence of what was said by the defendants at the time when they accepted the offer of the plaintiffs, viz. that some of the cotton had been brought on deck and was damaged, and that the damaged bales could be rejected on delivery. The agent examined only such bales as were stained or appeared externally to be injured; those that appeared fair on the outside he passed over without examination; he rejected eleven bales in the whole. The plaintiffs produced a bill of parcels received from the defendants, in these words: "New-York, 9 April, 1828. Messrs. T. W. Jenkins & Co. Bo't of Boorman & Johnston 89 bales of *cotton, as per annexed return, weighing*

35,803 lbs.—tare off, 716—35,087—11cts.—$3859,57—90 days ;" and also read in evidence a note for $3859,57, given by them to the defendants, bearing date 4mo. 9, 1828, payable 90 days after date, which it was admitted was paid at maturity. In reference to the *usage of trade* in the sale of cotton in the city of New-York, the following facts appeared : Upon the arrival of cotton, the cotton brokers usually apply to the owners for permission to take samples, which are accordingly taken and kept on hand, arranged on shelves in the ware-rooms of the brokers for the inspection of applicants, so long as the cotton from which the samples were taken remains in market. The samples, however many the hands through which cotton may pass, remain in the ware-rooms for exhibition during all that time ; it is not unfrequent that the same cotton is sold two or three times by the same samples. Cotton is examined by thrusting into the bale what is called a gimblet—an instrument in the form of a dirk, sharp at the point and flat and serrated on both sides, with the teeth bearing upwards ; its length varying from eight to fifteen inches. These gimblets are inserted into the bale to the depth of two or three inches. An experienced broker testified, in this case, that he should think it impossible to draw cotton from the centre of the bale without cutting a rope, and that was done only when it was suspected that cotton was fraudulently packed. Samples are taken, not by the brokers themselves, but by agents in their employ. The mere taking of samples in the usual way gives no authority to sell ; but when an offer to purchase is made to a broker, he communicates with the holder, who either accepts or declines the offer. In reference to this case, it was proved that the defendants were acquainted with the usual mode in which brokers obtained samples of cotton, that the samples exhibited to the plaintiffs in this case were taken under a general permission by the defendants to take samples of all cotton consigned to them, and that they paid the brokers for their services in effecting the sale. The plaintiffs further proved, that on 14*th May*, 1828, they sold the cotton purchased by them of the defendants to a manufacturing company called the *Dorchester Cotton and Iron Factory ;*

ALBANY,
Oct. 1834.

Boorman
v.
Johnston.

that they sold the same by *sample*; that in *February*, 1829, they were sued by the company for a breach of warranty, on the allegation that the bulk of the article did not correspond with the samples. On the *second* day of February, 1829, before putting in a plea, they gave notice of the suit to the defendants, and offered them the defence of it, which they declined. The plaintiffs then produced a record of recovery in that suit against themselves for $322,50, which sum it was admitted was on the 17th March, 1829, paid by the plaintiffs in satisfaction of that judgment. The plaintiffs also read in evidence, by the consent of the defendants, certain depositions taken in the suit of the Dorchester company against them, from which it appeared that large quantities of the cotton were damaged. The witnesses testified that the external appearance of the bales was good, and that the damage within could not be discovered without opening the bales; it could not be discovered by drawing out samples in the usual mode. The damaged cotton had the appearance of having been long exposed to the wet, or having had water poured on it, after it was packed, and being suffered to dry without being opened; it was matted together like paper which had been wet, and was no better than waste cotton used in making paper. The witnesses made an estimate of the extent of the damage. The plaintiffs had notice from the Dorchester company, in the first week of *June*, that the cotton was damaged; the agent of the company, after using eight or ten bales, on opening three bales discovered some damage, and concluded not to open any more until the vendors sent an agent to examine the cotton. The cotton was examined at different periods, between 8*th July* and 8*th August*. In an early stage of the trial, a witness for the plaintiff testified that it was the uniform *custom* in the New-York market in delivering *cotton*, to reject bales *externally damaged*, whether any thing was said in the contract about such rejection or not. This evidence was received by the judge, though objected to by the defendants' counsel. The plaintiffs rested.

The defendants moved that the plaintiffs be *nonsuited* on the following grounds: *First*, that the sale to the plaintiffs was *not a sale by sample*, because, 1. there was no reference to sam-

ALBANY,
Oct. 1834.

Boorman
v.
Johnston.

ples, either in the entry in the brokers' book, or in the bought and sold note, or in the bill of parcels ; 2. that the defendants did not draw or order the samples to be drawn, nor offer them or request them to be offered for the purpose of sale ; and 3. that the brokers were not the *agents* of the defendants in making the sale. *Second,* that the plaintiffs had an opportunity of inspecting the cotton, equal with the defendants. *Third,* that the plaintiffs did not rely upon the samples, but employed an agent to examine and reject for them ; and that he did reject a portion of the cotton. *Fourth,* that the plaintiffs sent the cotton abroad, or sold it to another who did send it abroad, thereby disabling themselves from returning it; and they made no offer to return it. *Fifth,* that the grounds of the plaintiffs' action ought to have been set up by way of *defence* to the note given on the sale. *Sixth,* that there was a variance between the declaration and proofs. The motion for a nonsuit was denied. The defendants then called witnesses to prove the acts of the agent of the brokers at the time of the delivery of the cotton, for the purpose of establishing the fact that the cotton was bought upon actual inspection, and not by sample. They also proved that the store in which their cotton was kept was opened in the morning and kept open until dark, and the cotton might be inspected during the day ; and they gave evidence that they had the cotton in question on consignment, and that the owner of the vessel in which the cotton came, took back the rejected bales ; but did not prove that the plaintiffs knew the fact that they had the cotton on consignment. The judge charged the jury that it was a question exclusively for their determination, whether the sale in this case was or was not a sale by sample ; that in deciding that question, they must determine whether the samples were exhibited to the plaintiffs, and whether they purchased by such samples ; whether the brokers were originally appointed the agents of the defendants, and whether, if not so originally appointed, the defendants had subsequently ratified the acts and negotiations of the brokers, knowing in what manner they had made the sale, and thereby rendered them their agents ; or whether the plaintiffs did not purchase upon their own inspection and examination of the cotton contain-

ed in the bales, without any reliance upon the samples ; all which were questions exclusively for their determination, and according as their decision should be upon them, they would find for the plaintiffs or for the defendants ; and if they found for the plaintiffs, then they might take into consideration the judgment in the suit of the Dorchester company against the plaintiffs, for the purpose of determining the amount of the verdict, but otherwise not. The jury found for the plaintiffs, upon which verdict a judgment was entered. The defendants sued out a writ of error.

*P. W. Radcliff & S. P. Staples*, for the plaintiffs in error.

*H. Ketchum & T. Fessenden*, for the defendants in error.

*By the Court*, Savage, Ch. J. I will briefly notice the exceptions taken at the trial, in the order in which they arose.

The first three exceptions relate to the *usage* of those in the cotton trade, both merchants and brokers. There are certain usages of trade which are adhered to by all persons in that particular trade, which, by common consent, acquire the form of law. It is true that such usages cannot control or alter the settled law. There could be no well founded objection to the testimony given in this case as to the mode of effecting sales by sample the custom of brokers to take samples, and the offer of them for the inspection of their customers. As samples were never taken but by consent of the owners, the fact of their being taken was a circumstance supporting the proposition that the brokers in this case were authorized to make the sale. It is very immaterial in this case whether this testimony was strictly admissible or not in so far as it related to the authority of the brokers, and the usage to reject the bales which appeared to be damaged, because it is in proof that an agreement existed that the bales externally injured should be rejected ; and the subsequent acts of the defendants below, acquiescing in the sale, delivering the cotton, and paying the brokerage, are abundant evidence of the authority of the brokers. To the evidence of the recovery against the plaintiffs by the Dorchester factory, there was no exception.

The next questions arise upon the motion for a nonsuit, and it is insisted, that the sale was not a sale by sample for various reasons, and principally because the written evidences of the sale, to wit, the entry in the brokers' book, the bought and sold note, and the bill of parcels, contain no reference to a sale by sample. This involves the inquiry how far parol evidence is admissible in reference to contracts which have been reduced to writing. It is not my purpose to discuss this subject at large, but to refer to some principles applicable to this case. I assume as correct the proposition that parol evidence is not admissible to contradict, alter or vary a written instrument, either then required by law to be in writing, or when entered into by the agreement of the parties, where no writing is necessary to the validity of the agreement. 3 Stark. Ev. 996, 1002, *et seq.* Where parties have made their bargain by parol, as they are usually made in the first instance, and then have committed it to writing, the presumption is that they have written as much as they deemed material. The rule in such case is, that the verbal contract being merged in the writing, that shall control, and shall not be contradicted by parol, though it may be explained if ambiguous. There are exceptions which it is not important now to notice. But parol evidence may be given to apply the written contract to the subject matter—in some instances, to explain expressions, used in a peculiar sense, when used by particular persons and applied to particular subjects. Hence Mercantile instruments are to be expounded according to the usage and custom of merchants. 3 Stark. Ev. 1033. It is perfectly right and consistent with fair dealing, to give effect to language used in a contract, as it is understood by those who make use of it. In ordinary transactions, it must be understood as mankind at large understand it; but where, in any particular trade, certain expressions acquire a peculiar meaning from the manner in which they are used, and the subjects to which they are applied, as was said by Chief Justice Gibbs in *Birch* v. *Depeyster*, 1 Stark. Cas. 167, evidence may be received of mercantile usage, to show the meaning of the term, just as you look into a dictionary to ascertain the meaning of words; though in that case he went farther, and .

ALBANY,
Oct. 1834.

Boorman
v.
Johnston.

permitted a conversation previous to entering into a written contract, to ascertain the meaning of the words *privilege* and *primage*, as used between the owners of a ship and the captain. It is true that where words have acquired a known legal meaning, it cannot be shown that they were used in a different sense, yet, in many instances, evidence of usage is admissible for the purpose of annexing incidents to a written instrument, concerning which the instrument is silent. This rests upon the presumption that the parties did not carry out the whole of their intention, but meant to be guided by usage in similar dealings. 3 Stark. 1038. So instances are given where the law annexes a meaning to terms apparently in contradiction to the writing. A note payable on its face in 60 days means a note payble in 63 days. So a note payable at a bank must be paid in banking hours. These usages are considered evidence of the assent of the parties to comply with them. I do not therefore see any objection to the evidence of usage given by the broker, as to the manner of making his entries. If it does not prove a warranty in the sale, neither does it disprove it; it leaves the instrument to the costruction of law upon its terms, connected with the subject matter and the parties concerned in the transaction.

I fully subscribe to the general doctrine, that in sales of personal property, the vendor is not liable for any defect in the article sold, without fraud or warranty. When the purchaser has an opportunity of examining the article which he purchases, the rule *caveat emptor* applies. There are exceptions, but they are not important in the decision of this case. If there is any thing settled in relation to mercantile law, it must be considered settled in this court, that a sale by sample is *per se* a warranty that the bulk shall correspond with the sample. This results from the principles already referred to, to wit, that the rule *caveat emptor* applies where the purchaser has an opportunity to examine the articles which he purchases. Cotton is sold by the bale. How can the purchaser examine the article? only externally and superficially, and the interior only to a small extent. The instruments with which the samples are taken in general are from eight to twelve inches in length, and samples are in fact taken

from about four inches. Such is the proof in this case : and it is further proved, that the damage in the middle of the bales could not have been discovered without opening the bales. Here is a good reason why *caveat emptor* should not apply. You cannot examine the article without opening the bales. That is never done—it would not be permitted, and would be attended with great expense and inconvenience. Hence, as I have heretofore said in the case of the *Oneida Manufacturing Company* v. *Lawrence*, 4 Cowen, 444 *every sale of packed cotton is a sale by sample*. It is so by the usage of trade, which is founded upon general convenience and consent : that usage is shown in this case. The brokers send their agents to the owners, and obtain permission to take samples. The object is perfectly understood ; it is to aid the owner in selling his merchandize, for which service the broker is to receive the usual compensation. This is not done without the owner's consent. I need not here discuss what acts constitute the agency of the broker ; for, in this case, the acts of the brokers, in the usual course of the business, were adopted and ratified, and there is an end of all question as to agency in this instance. I am showing that the sale of packed cotton is, and must be a sale by sample ; the evidence shows it is always so ; and I add, it must be so, because it cannot be made in any other manner, without an expense and inconvenience which could not be tolerated. If there ever was a sale by inspecting the bulk, the defendants had an opportunity to show it ; but no such pretence was alleged. It is said the buyer had an opportunity of judging as well as the seller, and sometimes does draw other samples than those exhibited by the broker ; but does that enable him to know whether the middle of the bale is composed of damaged cotton ? or whether water or some heavier substance has been introduced into the middle of the bale as is too often done ? Our books show too many instances of fraud in this article, and sound policy requires that the rule which has been adopted in the sale of it, should prevail. If courts hold that the same rule shall govern in this case as in the sale of a horse, where both parties have an equal chance to examine the article which is bought and sold, and there happens to have been fraud practiced by

the person who packed the cotton, it is manifest the purchaser may lose, and that without remedy: whereas, the rule established in such cases gives a remedy over by each person through whose hands the property has passed from the grower to the consumer, and thus the author of the fraud may be compelled to respond in damages for the injury of which he was the iniquitous cause. The rule *caveat emptor* in such a case holds out a premium to fraud: whereas the contrary punishes it, and thereby prevents future offences. When, therefore, the broker enters in his book, "Boorman & Johnston sold to T. W. Jenkins & Co. 100 bales of cotton," and the owners say, "Messrs. T. W. Jenkins & Co. Bo't of Boorman & Johnston 89 bales of cotton," the meaning is that they, the brokers and owners sold it *according to the known usages of the trade;* they sold it as other cotton dealers sell their cotton, that is, by sample: the effect of which sale is a warranty that the bulk is of equal quality with the samples exhibited when the sale was made. If, any other contract was made, if this case was an exception to the general rule, the burthen of proof lay on the defendants. It is no answer to say that the samples were not drawn at the defendants request they were drawn by their permission, and for their benefit, as well as the benefit of the brokers.

The preceding remarks embrace all which I think necessary to say upon the first three grounds upon which a nonsuit was asked.

The fourth point taken was, that there was no offer to return the cotton when the fraud was discovered. It is certainly a sufficient answer that the plaintiffs do not seek to recover the consideration or purchase money, but damages for the breach of the implied warranty. A purchaser is never bound to return an article unless the stipulations of the contract require it, or unless he wishes to dissaffirm the contract, and recover back the money which he has paid. In this case, the plaintiffs ask no such thing; they seek to enforce the contract. The point was well taken so far as to prevent a recovery upon the common counts, had the plaintiffs claimed to recover the purchase money, but I do not understand the plaintiffs as making such a demand.

The plaintiffs are not precluded from maintaining their action, because the grounds of it would have been a good defence to an action upon the notes to the extent of the damage sustained. When the notes were payable, the plaintiffs had sustained no damage ; and though they may have known that a claim was made upon them by the Dorchester factory, yet it had not been established against them, and could not be set up by them against the payment of the notes ; or even if it might, the circumstances of the case did not compel them to make the defence. The sale was made the 9th of April, 1828, at 90 days, payable about 9th July, 1828. On the 15th May, 1828, the cotton was sold to the Dorchester factory. In July, 1828, the cotton was examined, but the examination was not completed till the 8th August. The present plaintiffs were not sued until the 6th February, 1829, long after their note was paid at its maturity.

It was also contended that there was a variance between the declaration and proof, because the declaration did not state the cotton was to be paid for in 90 days. I do not consider the variance at all material ; but if it was, it was no ground of nonsuit at the trial, being amendable. 2 R. S. 406, § 79.

The charge of the learned judge at the trial was also excepted to, but, in my judgment, without cause. He instructed the jury to find, as questions of fact, whether the sale was by sample ; whether the brokers had authority by original appointment or subsequent ratification ; or whether the plaintiffs bought upon their own examination, without relying upon the samples : these were all questions of fact, proper for their decision. The charge was right, and all the previous decisions were right ; consequently the judgment of the superior court should be affirmed.

Judgment affirmed.